UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMAR BIBI,<br><br>  Plaintiff,<br><br>  v.<br><br>VXL ENTERPRISES, LLC, et al.,<br><br>  Defendants. | Case No. 21-cv-04670-EMC<br><br>**ORDER GRANTING VXL'S MOTION TO DISMISS, AND GRANTING IN PART AND DENYING IN PART DANIEL & YEAGER/TEAM HEALTH'S MOTION TO DISMISS**<br><br>Docket Nos. 34-35 |

Plaintiff Omar Bibi is a physician. He has filed an employment discrimination suit against multiple companies: VxL Enterprises LLC ("VXL"); Daniel & Yeager, LLC ("D&Y"); Sycamore Provider Contracting, L.L.C.; and Team Health, LLC. According to Dr. Bibi, he was terminated because of his race or because of a complaint he made about race discrimination; in addition, he was not thereafter hired for other jobs because of his race or because of a complaint about race discrimination.

Currently pending before the Court are two motions to dismiss: (1) one filed by VXL and (2) the other filed by D&Y and Team Health. Having considered the parties' briefs as well as the oral argument of counsel, the Court hereby **GRANTS** VXL's motion to dismiss and **GRANTS** in part and **DENIES** in part D&Y/Team Health's motion to dismiss.

### I. FACTUAL & PROCEDURAL BACKGROUND

Dr. Bibi initiated this suit in June 2021. *See* Docket No. 1 (complaint). In his original complaint, he brought employment discrimination claims (implicating race, ethnicity, and national origin) under Title VII and FEHA. According to D&Y and Team Health, the parties subsequently met and conferred, and Defendants argued to Dr. Bibi that, "as a matter of law, [he] was an

independent contractor, not an employee." Schwartz Decl. ¶ 4; *see also* Cal. Bus. & Prof. Code § 2418 (noting that California hospitals and medical groups and providers often use locum tenens agencies to help fill medical staffing needs and that such an agency "shall not be deemed to be an employer, employment agency, employment counseling service, job listing service, nurse's registry, temporary services employer, or leasing employer of a licensee [*i.e.*, physician]"; also providing that "[i]t shall be a rebuttable presumption that the relationship between the client or customer of the locum tenens agency and the licensee providing locum tenens services is one of an independent contractor").

Dr. Bibi thereafter amended his complaint and dropped his Title VII and FEHA claims. Now Dr. Bibi asserts claims for employment discrimination under 42 U.S.C. § 1981 and the California Unruh Act. The allegations supporting those claims include as follows.

Dr. Bibi is a licensed doctor who resides in Alabama. *See* FAC ¶¶ 5, 10. He is a U.S. citizen but is of Tunisian descent. He identifies as a Caucasian Arab and is a Muslim. *See* FAC ¶ 10.

VXL is "a security, logistics and services contractor." FAC ¶ 11. In July 2020, VXL entered into a contract with the California prison system to provide COVID-related medical relief, including at the San Quentin prison. *See* FAC ¶ 11. VXL "set up what is essentially a field hospital" at San Quentin to treat inmates with COVID. *See* FAC ¶ 12.

To staff its San Quentin field hospital, VXL entered into an arrangement with a locum tenens agency known as D&Y. *See* FAC ¶ 13. A locum tenens agency "typically operate[s] like a temporary staffing agency, placing physicians to work with their clients." FAC ¶ 13; *see also* Cal. Bus. & Prof. Code § 2418(c) (defining "locum tenens agency"). Team Health is a company affiliated with D&Y. *See* FAC ¶ 13.

In or about July 2020, Dr. Bibi entered into a contract with D&Y to work at VXL's San Quentin field hospital.[1] *See* FAC ¶ 14. Under the contract, Dr. Bibi would work thirty-two shifts (twelve hours each) from July to August 2020. *See* FAC ¶ 14. Although Dr. Bibi's contract was

---

[1] D&Y has submitted a copy of the contract as an exhibit attached to its motion to dismiss. *See* Schwartz Decl., Ex. 1 (contract, dated July 2020).

with D&Y, D&Y did not have any personnel on site at San Quentin. Instead, VXL supervised and controlled his on-site work. Specifically, VXL hired a Chief Medical Officer to supervise the physicians on site, including Dr. Bibi. *See* FAC ¶ 15.

VXL's Chief Medical Officer was Andre Pennardt. *See* FAC ¶ 17. During Dr. Bibi's first few days working at San Quentin (in July 2020), Dr. Pennardt told him that, "'If you look up Omar Bibi, you find seven felonies.'" FAC ¶ 17. During that same timeframe, Dr. Pennardt made another derogatory comment about Dr. Bibi. Specifically, when another doctor said to Dr. Bibi that a lunch he had prepared looked good and that he should open a restaurant, Dr. Pennardt commented that "he was sure Dr. Bibi would serve a lot of hummus, but would make for a better gun runner or drug dealer." FAC ¶ 19. Finally, Dr. Pennardt treated Dr. Bibi unfairly on multiple occasions. For example, even though doctors were allowed to do brief errands, Dr. Pennardt criticized Dr. Bibi when he did so (such as "leaving the premises briefly to get food and his own medications"). FAC ¶ 18. Also, Dr. Pennardt accused Dr. Bibi of being late for work, of skulking (*i.e.*, not working during his shift), and of not wearing protective gear even though none of those accusations were justified. *See* FAC ¶ 18.

On July 28, 2020, Dr. Bibi reached out to his contact at D&Y, Nicole Siebert, and spoke to her for almost thirty minutes about Dr. Pennardt's comments and conduct. *See* FAC ¶ 20. Apparently, later that same day or soon thereafter, different D&Y representatives called Dr. Bibi and told him that he was being terminated for cause and "'there was nothing D&Y could do about it.'" FAC ¶ 21. Dr. Pennardt walked Dr. Bibi out of the prison and said to him that, according to VXL's Program Manager, he was being terminated because he was "'too much of a liability.'" FAC ¶ 21.

Since the termination, Dr. Bibi has applied for other jobs with Team Health but has not been hired. *See* FAC ¶ 28 & Ex. A (chart listing Team Health jobs). The chart in Exhibit A indicates that Dr. Bibi started to apply for other jobs with Team Health in May 2021 through September 2021.

Based on, *inter alia*, the above allegations, Dr. Bibi has asserted the following causes of action:

1    (1) Race discrimination in violation of 42 U.S.C. § 1981.  This claim appears to be
2         based on both wrongful termination and failure to hire.  *See* FAC ¶ 30 (referring to
3         Dr. Bibi's "termination from San Quentin and [the] refusal to interview and failure
4         to hire for multiple positions with Team Health and/or its affiliates").
5    (2) Retaliation in violation of § 1981.  In this claim, Dr. Bibi asserts as retaliatory
6         conduct both the termination and the failure to hire.  *See* FAC ¶ 35 (alleging that,
7         after Dr. Bibi made complaints about discrimination, he was "terminated from his
8         position at San Quentin . . . [and] denied subsequent employment opportunities by
9         Defendants and/or affiliates of Team Health").
10   (3) Failure to hire in violation of § 1981.  Here, Dr. Bibi alleges failure to hire based on
11        race discrimination and on his having engaged in protected activity.  *See* FAC ¶ 40
12        (alleging that "positions were filled by members outside of his protected class, and
13        individuals who did not make informal and/or formal complaints about
14        discrimination based upon color, race, ethnicity and national origin").  This claim
15        seems somewhat duplicative in light of the two claims above.
16   (4) Discrimination and retaliation in violation California Civil Code § 51.5.

## II.    DISCUSSION

### A.    Legal Standard

Federal Rule of Civil Procedure 8(a)(2) requires a complaint to include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2).  A complaint that fails to meet this standard may be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).  *See* Fed. R. Civ. P. 12(b)(6).  To overcome a Rule 12(b)(6) motion to dismiss after the Supreme Court's decisions in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), a plaintiff's "factual allegations [in the complaint] 'must . . . suggest that the claim has at least a plausible chance of success.'" *Levitt v. Yelp! Inc.*, 765 F.3d 1123, 1135 (9th Cir. 2014).  The court "accept[s] factual allegations in the complaint as true and construe[s] the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).  But "allegations in a

1  complaint . . . may not simply recite the elements of a cause of action [and] must contain sufficient
2  allegations of underlying facts to give fair notice and to enable the opposing party to defend itself
3  effectively." *Levitt*, 765 F.3d at 1135 (internal quotation marks omitted). "A claim has facial
4  plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable
5  inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The
6  plausibility standard is not akin to a probability requirement, but it asks for more than a sheer
7  possibility that a defendant has acted unlawfully." *Id.* (internal quotation marks omitted).

B.   Section 1981 Claims

Dr. Bibi's first three claims are all based on § 1981. In essence, the claims are that Defendants (1) terminated him based on his race and his having made a complaint about racial discrimination and (2) failed to hire him based on his race and his having made a complaint about racial discrimination.

Section 1981 provides as follows: "All persons . . . shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens." 42 U.S.C. § 1981(a); *see also id.* § 1981(b) (defining "make and enforce contracts" as including "the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship"). The statute "offers relief when racial discrimination blocks the creation of a contractual relationship, as well as when racial discrimination impairs an existing contractual relationship, so long as the plaintiff has or would have rights under the existing or proposed contractual relationship." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006).

1.   VXL

As an initial matter, VXL argues that all of the § 1981 claims asserted against it should be dismissed because it did not have a contractual relationship with Dr. Bibi. The FAC includes allegations that VXL had a contract with San Quentin – and that D&Y had a contract with Dr. Bibi – but nowhere is there an allegation that VXL and Dr. Bibi entered into a contract with one another.

In response, Dr. Bibi suggests that he did have a contractual relationship with VXL –

5

specifically, based on an email which stated that he was "working for VxL." Opp'n, Ex. 1 (email). However, the email on which he relies does not support there being such a relationship. The email was not written by VXL but rather a third party (Sycamore).

Confronted with this problem, Dr. Bibi contends that the "contract" element of § 1981 has nevertheless been met because, as indicated above, there was a contractual relationship between VXL and D&Y, with D&Y essentially acting as VXL's subcontractor. *See* Opp'n, Ex. 1 (email from Sycamore to doctors hired for San Quentin job) ("While all of the physicians working on this project have been recruited by and are being paid by Sycamore & D&Y, *our companies are functioning as sub-contractors to VxL on this project*, which means that we are all taking our orders from VxL . . . .") (emphasis added). But Dr. Bibi fails to explain how this subcontract relationship enables him to bring a § 1981 claim against VXL. For example, he has not explained how he has any rights under the subcontract vis-à-vis VXL. *See Domino's*, 546 U.S. at 476 ("Any claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship' under which the plaintiff has rights."). Nor has he pointed to any authority indicating that, by working for the subcontractor D&Y (thus helping D&Y perform its contract with VXL) he thereby had some kind of contractual relationship with VXL for purposes of § 1981. Nor does he contend that VXL interfered with his contract with D&Y in a manner that implicates § 1981.[2]

Because Dr. Bibi has failed to make allegation that racial discrimination blocked the creation of a contractual relationship, or impaired an existing contractual relationship, he has failed to plead a § 1981 claim against VXL. The Court also notes that any § 1981 claim based on a failure to hire also fails as to VXL because, similar to above, the denial of contract rights was by Team Health, not VXL. It was Team Health which made the decisions when Dr. Bibi subsequently applied for various positions with the company.

2. D&Y/Team Health

Unlike VXL, D&Y did (as alleged) have a contractual relationship with Dr. Bibi. The question for D&Y is whether there are sufficient allegations that (1) it terminated Dr. Bibi based

---

[2] The Court notes that, at the hearing, Dr. Bibi expressly stated that he was not bringing a § 1981 claim based on the theory that Dr. Pennardt created a hostile work environment.

on his race or based on his having made a complaint about race discrimination and/or that (2) it (or rather Team Health, a company affiliated with D&Y) failed to hire Dr. Bibi based on his race or based on his having made a complaint about race discrimination.

### a. Termination

To the extent Dr. Bibi asserts D&Y terminated him based on his race, the Court finds that the allegations in support are insufficient. According to Dr. Bibi, it may be inferred that D&Y terminated him based on his race because (1) he was subject to the ultimate discipline of termination for minor infractions only (*e.g.*, losing his keys, not wearing protective gear) and because (2) Dr. Pennardt made discriminatory statements. But even if Dr. Bibi was treated unfairly or severely, he must point to facts indicating that the mistreatment was *because of his race* which he has not done. He has not alleged, for instance, that workers of a different race or ethnicity who committed similar errors were not as severely sanctioned. *Cf. Pac. Shores Props., Ltd. Liab. Co. v. City of Newport Beach*, 730 F.3d 1142, 1159 (9th Cir. 2013) (noting that the *McDonnell Douglas* test "permits a plaintiff to raise an inference of discrimination by identifying a similarly situated [person or] entity who was treated more favorably") (emphasis omitted); *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012) (noting that, "'[a]ll things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination"; the purpose of the similarly situated prong "is to eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable' – discriminatory animus"). Nor has he alleged that D&Y decision-makers made prejudicial comments. *Cf. Cordova v. State Farm Ins. Cos.*, 124 F.3d 1145, 1149 (9th Cir. 1997) (noting that plaintiff "offered direct evidence of such discriminatory animus: [the manager's] alleged comments that [another employee] was a "dumb Mexican" and that he was hired because he was a minority[;] [s]uch derogatory comments can create an inference of discriminatory motive"). As for Dr. Pennardt's discriminatory statements, Dr. Pennardt (as alleged) works for VXL, not D&Y. Dr. Bibi has not alleged that Dr. Pennardt had any influence over D&Y's decision to terminate Dr. Bibi. At this point, it is simply speculative that Dr. Pennardt impacted D&Y's decision to

7

terminate.

However, to the extent Dr. Bibi contends D&Y terminated him because he made a complaint about race discrimination, that claim (*i.e.*, a claim for retaliation) is plausible. A claim for retaliation may be brought under § 1981. *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 457 (2008) ("hold[ing] that 42 U.S.C. § 1981 encompasses claims of retaliation"). "To establish a prima facie case of retaliation, a plaintiff must prove (1) she engaged in a protected activity; (2) she suffered an adverse employment action; and (3) there was a causal connection between the two." *Surrell v. Cal. Water Serv.*, 518 F.3d 1097, 1108 (9th Cir. 2008) (indicating that a claim for retaliation, whether under Title VII or § 1981, has the above elements). In the case at hand, Dr. Bibi has alleged that he made a complaint about race discrimination to D&Y on July 28, 2020. *See* FAC ¶ 20 (alleging that Dr. Bibi contacted Ms. Seibert of D&Y and spoke to her for almost 30 minutes "about Dr. Pennardt's discriminatory comments"). Dr. Bibi has also alleged an adverse employment action – *i.e.*, that he was terminated. Finally, a causal connection between the protected activity and adverse employment action may be inferred based on the timing – he appears to have been terminated later the same day or soon thereafter. *See Yartzoff v. Thomas*, 809 F.2d 1371, 1376 (9th Cir. 1987) (noting that causation can be established through direct or circumstantial evidence, and the latter includes "the employer's knowledge that the plaintiff engaged in protected activities and the proximity in time between the protected action and the allegedly retaliatory employment decision"). *Compare Gordon v. Hughes*, No. 2:13-CV-01072-JAD-GWF, 2015 U.S. Dist. LEXIS 45939, at *4-5 (D. Nev. Apr. 8, 2015) (in discussing claim for retaliation, finding gap of three months sufficient to support inference of causation between protected activity and adverse act), *with Manatt v. Bank of Am., NA*, 339 F.3d 792, 802 (9th Cir. 2003) (finding gap of nine months insufficient).

    b. <u>Failure to Hire</u>

For the failure to hire claim, the correct defendant would appear to be Team Health rather than D&Y – *i.e.*, based on the FAC, it appears that Dr. Bibi applied for Team Health jobs, and not another job with D&Y.

To the extent Dr. Bibi argues that Team Health did not hire him because of his race, that

8

claim is not plausible based on the facts alleged. There is nothing to indicate that, during the relevant time frame (the FAC indicates that Dr. Bibi applied for positions during the period May 2021-September 2021), there was anyone at Team Health who had a racial animus or that other similarly or less qualified individuals were hired instead of Dr. Bibi. *Cf. McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Nor is there any alleged evidence of racial animus influencing Team Health's hiring decisions.

As for Dr. Bibi's claim that Team Health did not hire him because he had made a complaint about racial discrimination, there are problems here as well. To the extent Dr. Bibi suggests that Team Health declined to hire him because of the complaint that he made back to D&Y in June 2020 (right before he was terminated), there appear to be two problems. First, it is not clear that Team Health knew about the complaint of race discrimination. The complaint was made to D&Y, not Team Health. Although Dr. Bibi has alleged that D&Y and Team Health are affiliated companies, that fact in and of itself makes Team Health's knowledge of the complaint only possible, not plausible. In the absence of a plausible allegation of knowledge on the part of Team Health, Dr. Bibi has not adequately alleged a causal connection between the protected activity and the adverse employment action. Second, the timing also does not support a causal connection between the protected activity and the adverse employment action. Dr. Bibi made the complaint about race discrimination to D&Y in July 2020. He did not apply for a Team Health job until almost a year later, in May 2021.

Implicitly recognizing this problem, Dr. Bibi has suggested in his FAC that he engaged in additional protected activity – *i.e.*, he filed a discrimination charge with the EEOC in August 2020. *See* FAC ¶ 24. In addition, he initiated this lawsuit against, *inter alia*, Team Health in June 2021.

- To the extent Dr. Bibi relies on the EEOC discrimination charge, there are still the problems of (1) no evidence of knowledge of the charge on the part of Team Health (presumably, the charge would have been made against D&Y only) and (2) timing lag.

- As for the fact that he filed this lawsuit, it is a closer call. Dr. Bibi filed this lawsuit

1    on June 17, 2021.  The chart attached to the FAC indicates that Dr. Bibi applied for
2    multiple positions with Team Health on or after this date.  *See* FAC, Ex. 1 (chart)
3    (indicating that Dr. Bibi applied for jobs on June 16, 17, July 1, August 16, and
4    September 23; in some instances, Dr. Bibi applied for multiple jobs on the same
5    date).  The timing therefore could suggest a causal connection.  The problem for
6    Dr. Bibi is that, to support a claim for retaliation, he would need to show that the
7    relevant hiring decisionmaker at Team Health knew or at least could have known
8    about the lawsuit.  Based on the allegations in the operative complaint, a reasonable
9    inference cannot be made that litigation information would be passed on to hiring
10   decisionmakers.

C.     Section 51.5 Claim

In addition to the federal § 1981 claims, Dr. Bibi brings a claim for a violation of state law – specifically, California Civil Code § 51.5.  Section 51.5 provides in relevant part that "[n]o business establishment of any kind whatsoever shall discriminate against, boycott or blacklist, or refuse to buy from, contract with, sell to, or trade with any person in this state on account of any characteristic listed or defined in subdivision (b) or (e) of Section 51."  Cal. Civ. Code § 51.5.  This includes, *e.g.*, race, color, and national origin.  *See id.* § 51(b) (providing that "[a]ll persons within the jurisdiction of this state are free and equal, and no matter what their sex, race, color, religion, ancestry, national origin, [etc.] are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever").  California courts have commented on the relationship between § 51.5 and § 51 as follows:

> Section 51 prohibits discrimination by business establishments based on "sex, color, race, religion, ancestry, national origin, or disability."  A number of cases hold that the classifications of section 51 are not exclusive but illustrative only; they note the statute prohibits all arbitrary discrimination by business establishments.  Section 51.5 expands on section 51 by, inter alia, specifying forms of discrimination, including refusal to deal.

*Roth v. Rhodes*, 25 Cal. App. 4th 530, 537 (1994).

Both VXL and D&Y/Team Health have moved to dismiss the § 51.5 claim on the basis

10

that § 51.5 provides for relief only in the context of a proprietor-customer relationship or something similar – not, *e.g.*, in the context of an employment-like relationship. *See Rojo v. Kliger*, 52 Cal.3d 65, 77 (1990) (stating that "the Unruh Civil Rights Act [§ 51] has no application to employment discrimination"); *Alcorn v. Anbro Eng'g, Inc.*, 2 Cal. 3d 493, – (1970) (stating that "there is no indication that the Legislature intended to broaden the scope of section 51 to include discriminations other than those made by a 'business establishment' in the course of furnishing goods, services or facilities to its clients, patrons or customers"); *Payne v. Anaheim Mem. Hosp.*, 130 Cal. App. 4th 729, 747 (2005) (noting that the California legislature's enactment of FEHA concurrently with the Unruh Civil Rights Act "'indicated a legislative intent to exclude the subject of discrimination in employment from the latter act'[;] ][i]n other words, the issue of discrimination within the employment relationship was excluded from the UCRA, not because it was undeserving of attention, but because it was specifically addressed within a different statutory scheme"); *see also Strother v. S. Cal. Permanente Med. Grp.*, 79 F.3d 859, 875 (9th Cir. 1996) (noting that, "[o]n its face, § 51.5, like § 51, appears to be aimed only at discrimination in relationships similar to the proprietor/customer relationship [–] [a]ll the forbidden acts referred to except 'discriminate' expressly refer to transactions of a proprietor/customer sort" – and therefore "hold[ing] that Strother, as either a partner or employee [of the defendant medical group], cannot bring a claim under § 51.5.").

Defendants are correct in their assessment of § 51.5. The *Payne* case cited by Dr. Bibi is not to the contrary. Notably, the court in *Payne* distinguished *Strother* (a Ninth Circuit case) because, there, the plaintiff had sued the medical group where she worked as a partner or employee. In contrast, in *Payne*, the plaintiff was suing a hospital with which he did not have an employment-like relationship.

> Anaheim Memorial [the defendant-hospital] does not even suggest the relationship might be one of employer and employee, which would be governed by the FEHA, and we assume it would protest mightily if Payne attempted to do so. Payne does not work for the hospital, and has no obligation to treat his patients there as opposed to any other hospital. Anaheim Memorial does not compensate Payne for his medical services, nor does it exercise any direct control over the manner in which he practices. *Instead, the hospital merely provides a facility which a qualified physician may access in*

11

> *connection with providing medical care to his patients.*

*Payne*, 130 Cal. App. 4th at 748 (emphasis added).

In *Johnson v. Riverside Healthcare System*, 534 F.3d 1116 (9th Cir. 2008), the Ninth Circuit similarly concluded that *Strother* and *Payne* were reconcilable. The plaintiff in *Johnson*, like the plaintiff in *Payne*, sued a hospital for, *inter alia*, a § 51/51.5 violation. However, the relationship that the *Johnson* plaintiff had with his hospital was different from the relationship that the *Payne* plaintiff had with his hospital:

> Johnson was compensated while Payne was not. In finding Payne's claims against his hospital cognizable under § 51, the court in Payne explained, "Payne does not work for the hospital, and has no obligation to treat his patients there as opposed to any other hospital. Anaheim Memorial does not compensate Payne for his medical services, nor does it exercise any direct control over the manner in which he practices. Instead, the hospital merely provides a facility which a qualified physician may access in connection with providing medical care to his patients." Riverside, on the other hand, paid Johnson $ 250 per month to be on call in its emergency room and also compensated him for each trauma patient he treated in an amount not to exceed $ 10,000 per month.

*Id.* at 1125-26. The Ninth Circuit also noted that the *Johnson* plaintiff – though technically a contractor with the hospital – in effect had an employment relationship with the hospital in that the hospital "retained control over all material aspects of his activities at the hospital" (*e.g.*, the hospital determined his shifts, which nurses would be assigned to him, etc.). *Id.* at 1126; *see also id.* ("find[ing] nothing in the . . . holding in *Payne* to counsel" otherwise "because the hospital in that case neither compensated the plaintiff nor controlled the manner of his practice to the degree Riverside does here").

In light of, *inter alia*, *Johnson*, Dr. Bibi's § 51.5 claim is dismissed as to D&Y and Team Health. He had an employment-like contractual relationship with D&Y and attempted to have such a relationship with Team Health. Thus, claims that D&Y terminated him or that Team Health failed to hire him are not viable.

Similarly, to the extent Dr. Bibi suggests that VXL acted like an employer in that it had control over his activities at San Quentin, that would make their relationship an employment-like relationship and thus would fall outside coverage under the Unruh Act. In any event, there is

12

1    nothing to indicate that VXL played a role in Dr. Bib's termination.

2    According to Dr. Bibi, the Court should still find that he has a viable § 51.5 claim because,
3    in *Payne*, the state court suggested that, if a relationship is "ultimately deemed not to be one of
4    employee-employer, then the rationale for excluding it from the UCRA disappears." *Payne*, 130
5    Cal. App. 4th at 748 n.10 (stating that "[w]e do not necessarily agree with the Ninth Circuit's
6    conclusion [in *Strother*] to the extent it suggests the physician might be ultimately . . . denied a
7    remedy under either the FEHA or the UCRA"). Dr. Bibi does not have a FEHA claim here. *See*
8    Cal. Bus. & Prof. Code § 2418 (noting that California hospitals and medical groups and providers
9    often use locum tenens agencies to help fill medical staffing needs and that such an agency "shall
10   not be deemed to be an employer, employment agency, employment counseling service, job listing
11   service, nurse's registry, temporary services employer, or leasing employer of a licensee [*i.e.*,
12   physician]"; also providing that "[i]t shall be a rebuttable presumption that the relationship
13   between the client or customer of the locum tenens agency and the licensee providing locum
14   tenens services is one of an independent contractor"). Accordingly, Dr. Bibi contends he must by
15   default have a § 51.5 claim. Although the Court is not without some sympathy for this argument,
16   the Court nevertheless rejects it. The statement made by the *Payne* court was equivocal, and the
17   Ninth Circuit's position in *Johnson* was clear. The distinction between business-consumer and
18   employer-employee relationship which defines the contours of the Unruh Act does not change as a
19   result of § 2418.

20                       **III.    CONCLUSION**

21   For the foregoing reasons, the Court grants VXL's motion to dismiss in its entirety and
22   grants in part and denies in part D&Y's motion. The one claim that is plausible based on the
23   allegations in the operative pleading is the claim against D&Y for retaliation – specifically, based
24   on Dr. Bibi's termination after he complained to Ms. Siebert of Dr. Pennardt's discriminatory
25   conduct.
26   ///
27   ///
28   ///

The Court, however, shall give Dr. Bibi an opportunity to file an amended complaint to address the deficiencies identified above for his § 1981 claims (but not his § 51.5 claim) if he can do so in good faith. Any amended complaint shall be filed within four weeks of the date of this order.

This order disposes of Docket Nos. 34 and 35.

**IT IS SO ORDERED**.

Dated: December 20, 2021

_____
EDWARD M. CHEN
United States District Judge

14