UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| OMAR BIBI,<br><br>                    Plaintiff,<br><br>          v.<br><br>DANIEL & YEAGER, LLC, et al.,<br><br>                    Defendants. | Case No.  21-cv-04670-EMC<br><br>**ORDER GRANTING DEFENDANT DANIEL & YEAGER'S MOTION FOR SUMMARY JUDGMENT**<br><br>Docket No. 78 |

Plaintiff Omar Bibi is a physician.  He has filed a retaliation claim under 42 U.S.C § 1981 against defendant Daniel & Yeager, LLC ("D&Y").  According to Dr. Bibi, D&Y terminated his contract to provide COVID-related medical services at a field hospital located at San Quentin State Prison ("Prison") because he lodged a complaint about racially discriminatory behavior by a supervisor at the Prison.

Currently pending before the Court is D&Y's motion for summary judgment as to (1) Dr. Bibi's retaliation claim and (2) Dr. Bibi's request for punitive damages.  Having considered the parties' briefs as well as the oral argument of counsel, the Court hereby **GRANTS** D&Y's motion in its entirety.

## I.          FACTUAL AND PROCEDURAL BACKGROUND[1]

Dr. Bibi brought this suit in June 2021, originally against four defendants including D&Y. *See* Docket No. 1.  The claims against all other defendants have either been settled or dismissed, and only Dr. Bibi's claim of retaliation under Section 1981 against D&Y remains.  *See* Docket

---

[1] The parties do not dispute the following facts unless otherwise noted.

Nos. 32, 55, 58, 70.

Dr. Bibi's allegations stem from his contract to provide COVID-related medical services at the Prison field hospital during the summer of 2020.  The California Department of Corrections and Rehabilitation contracted with VxL Enterprises, LLC ("VxL") to provide care to inmates affected by COVID at California state prisons.  *See* Docket No. 58 ("SAC") ¶ 9.  VxL "set up what is essentially a field hospital" at San Quentin State Prison, *id.* ¶ 10, and contracted with two locum tenens agencies[2]—D&Y and Sycamore Physician Contracting, LLC ("Sycamore")[3]—to staff the Prison field hospital.  *See* Docket No. 26 ("FAC") ¶ 13.

On July 6, 2020, Dr. Bibi entered into a contract with D&Y to provide medical services at the Prison field hospital.  *See* SAC ¶ 14.  Dr. Bibi's contract was to run from July 20, 2020 until August 20, 2020, and was to consist of 32 consecutives twelve-hour shifts, each running from 7 a.m. to 7 p.m.  *See id.* ¶¶ 12, 14.  Even though D&Y hired Dr. Bibi, it maintained no on-premises presence at the Prison field hospital.  Docket No. 80 ("McDonald Decl.") ¶ 4.  Instead, contracted physicians at the Prison field hospital worked under the direction of Dr. Andre Pennardt, VxL's Chief Medical Officer for that hospital.  *Id.* ¶ 6; *see* Bibi Dep. Tr. at 47:10–15.

A.    Dr. Bibi Had Performance Issues During His First Six Days at the Prison

Dr. Bibi's tenure at the Prison field hospital was tumultuous.  On the first day of his contract, he did not arrive at the Prison until around 10 a.m., three hours after the start of his shift.  *See* Bibi Dep. Tr. at 40:25–41:3, 42:2–44:10.  Dr. Bibi arrived late to his shift again on days 2 and 4.  *See id.* at 53:2–10; McDonald Decl., Ex. A.  After he arrived late on day 4, Dr. Bibi had a phone call with Nicole Seifert and Scott McDonald, D&Y's Senior Staffing Consultant and Territory Manager-West Region, respectively.  *See* McDonald Decl. ¶ 7, Ex. A.  They told him to show up on time and to do what was expected of him.  *See* Bibi Dep. Tr. at 70:18–71:21.  Dr. Bibi then had a substantially similar phone conversation with Greg Ellner, Director of Recruitment at

---

[2] A locum tenens agency "operates like a staffing agency, and contracts with physicians to work for [the firm's] healthcare clients on an independent contractor basis."  Docket No. 80 ("McDonald Decl.") ¶ 3.

[3] Erroneously named as Sycamore Provider Contracting, L.L.C.  (Docket No. 32.)

United States District Court
Northern District of California

1   D&Y.  *See id.* at 76:22–77:21; McDonald Decl., Ex. D.

2       Dr. Bibi's performance issues did not stop at tardiness.  On day 3, Dr. Bibi left the prison

3   without approval to purchase food.  *See* Bibi Dep. Tr. at 63:1–64:10.  On day 5, Dr. Bibi

4   misplaced his California Department of Corrections and Rehabilitation Identification Card.  *See id.*

5   at 92:16–18.  That same day, Dr. Bibi failed to sign out of the Prison in violation of the Prison's

6   security policy, possibly because he did not know about the sign-out protocol.  *See* McDonald

7   Decl. ¶ 9; Bibi Dep. Tr. at 64:11–25.

8       As a result of failing to sign out on day 5, Dr. Bibi could not find his patient list on the

9   morning of day 6.  *See* McDonald Decl., Ex. C.  That morning, Dr. Pennardt reported that he "saw

10  [Dr. Bibi] walk into the physician's room at 0717," 17 minutes after the start of his shift.

11  McDonald Decl. ¶ 10, Ex. C.  Later on day 6, Dr. Bibi was involved in a disagreement with Dr.

12  Pennardt and another provider over who was responsible for taking care of a patient experiencing

13  chest pains.  *See* McDonald Decl., Ex. C.  That same day, Dr. Bibi went to a nursing station

14  without wearing the proper personal protective equipment ("PPE").  *See id.*

15      On day 6, Dr. Pennardt sent an email to VxL detailing the issues with Dr. Bibi's conduct.

16  *See* McDonald Decl., Ex. C.  That email discussed (1) that Dr. Pennardt saw Dr. Bibi walk into the

17  physician's room at 7:17 a.m. on day 6, (2) that Dr. Bibi did not sign out from the Prison on the

18  night of day 5 and therefore could not find his patient list on day 6, (3) that Dr. Bibi failed to take

19  care of a patient with chest pains on day 6, (4) that Dr. Bibi walked to a nursing station without

20  proper PPE on day 6, and (5) that Dr. Bibi fell asleep at work around 5:00 p.m. on day 6.[4]  That

21  email was eventually forwarded to McDonald at D&Y.  *See id.*

22  B.    On Days 8 and 9, D&Y and Its Partners Decided to Terminate Dr. Bibi's Contract

23      On day 8, in response to Dr. Pennardt's email, McDonald sent an email to other D&Y staff

24  members advocating for terminating Dr. Bibi, explaining:

25          We need to let Bibi go to correct the ship. We have cause. Multiple
            instances of cause. He is litigious, but again, we have cause.
26

27

28  _____
    [4] Dr. Bibi disputes that he ever fell asleep at work.  *See* Bibi Dep. Tr. at 96:23–97:9.

United States District Court
Northern District of California

1   *Id.* Ellner responded that he "[didn't] disagree" with McDonald's assessment, but that they should

2   communicate with their partners at Sycamore and VxL to make sure that they had "a coalition on

3   that decision." *Id.*

4         McDonald started to build the coalition later on day 8.  He sent an email to Sycamore,

5   stating:

6               Dr. Bibi is still a recurring issue and we have backups to replace him
                that will work much better with VXL and us all.  Since you write the
7               schedule you say "when" on Bibi. We have cause to replace him as
                attached.  Just let me know on when.
8

9   McDonald Decl., Ex. D.  He attached Dr. Pennardt's email from day 6 detailing some of Dr.

10  Bibi's performance issues.  *See id.*  Sycamore responded that it was "targeting a 7/29 end date for

11  Dr. Bibi with his replacement starting on 7/30," but needed scheduling confirmation from other

12  doctors before solidifying its plans.  McDonald Decl., Ex. E.  Only a few minutes later, McDonald

13  received a response saying:

14              VxL confirmed to terminate Bibi at the end of his shift on [day 10].
                [McDonald] will contact Bibi at 7pm PT to break the news. For
15              timing and sensitivity reasons, can D&Y coordinate Bibi's travel
                home on [day 11]?
16

17  *Id.*  On day 9, Sycamore emailed VxL to report that Dr. Bibi had once again shown up late for his

18  shift.  *See* McDonald Decl., Ex. F.  In that email, Sycamore offered to move up Dr. Bibi's

19  termination from day 10 to day 9.  *See id.*  VxL responded that it would like for Dr. Bibi's contract

20  to be terminated at 6:45 p.m., near the end of his shift, on day 9.  *See id.*  VxL asked Sycamore to

21  "[p]lease call or text . . . to confirm it's done so we can get him the hell of our books ASAP."  *Id.*

22  That email was forwarded to D&Y.  *See id.*  At noon that day, D&Y confirmed in an email to

23  Sycamore that it planned to terminate Dr. Bibi's contract on day 9, stating:

24              We will make the call at [6:45pm local time]. We will get on a
                conference line and I will call in Bibi.
25

26  *Id.*  Sycamore responded that it "sound[ed] like a plan" and that it "appreciate[d] it!"  *Id.*

27  C.    <u>On Day 9, Dr. Bibi Complained of Racially Discriminatory Conduct by Dr. Pennardt</u>

28         Dr. Pennardt made two racially discriminatory remarks to Dr. Bibi on day 8 or 9.  *See* Bibi

*United States District Court*
*Northern District of California*

4

United States District Court
Northern District of California

1  Dep. Tr. at 124:7–22 (testifying to timing).  First, Dr. Pennardt told Dr. Bibi that "if you look up

2  Omar Bibi, you find seven felonies."  *Id.* at 122:7–9.  Second, after another doctor remarked that

3  Dr. Bibi had prepared a good-looking lunch and that he should open a restaurant, Dr. Pennardt

4  said that "Dr. Bibi would serve a lot of hummus at the restaurant, but would make for a better gun

5  runner or drug dealer."  *Id.* at 136:6–13.  Dr. Bibi further testified that Dr. Pennardt's "demeanor

6  toward [him] drastically changed" after Dr. Pennardt learned that Dr. Bibi is of Arab Tunisian

7  descent.  *Id.* at 145:9–22.

8      At 1:46 p.m. on day 9, after D&Y had informed Sycamore that it would terminate Dr. Bibi

9  at the end of the day, Dr. Bibi called Seibert and complained about Dr. Pennardt's discriminatory

10  conduct towards him.  *See id.* at 130:17–22; SAC ¶ 18.

11  **D.    D&Y Terminated Dr. Bibi's Contract After His Shift on Day 9**

12      At or around 6:45 p.m. on day 9, several hours after Dr. Bibi had lodged his complaint

13  about Dr. Pennardt's discriminatory conduct, D&Y called Dr. Bibi to inform him that his contract

14  had been terminated.  *See* McDonald Decl. ¶ 15.

15  **II.    DISCUSSION**

16  **A.    Legal Standard**

17      Federal Rule of Civil Procedure 56 provides that a "court shall grant summary judgment

18  [to a moving party] if the movant shows that there is no genuine dispute as to any material fact and

19  the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is

20  genuine only if there is sufficient evidence for a reasonable jury to find for the nonmoving party.

21  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986).  "The mere existence of a

22  scintilla of evidence . . . will be insufficient; there must be evidence on which the jury could

23  reasonably find for the [nonmoving party]."  *Id.* at 252.  At the summary judgment stage, evidence

24  must be viewed in the light most favorable to the nonmoving party and all justifiable inferences

25  are to be drawn in the nonmovant's favor.  *See id.* at 255.

26      Where a defendant moves for summary judgment based on a claim for which the plaintiff

27  bears the burden of proof, the defendant need only point to the plaintiff's failure "to make a

28  showing sufficient to establish the existence of an element essential to [the plaintiff's] case."

5

United States District Court
Northern District of California

1   *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

2   B.   Retaliation Claim

3         Section 1981 provides that:

4             All persons within the jurisdiction of the United States shall have the
             same right in every State and Territory to make and enforce
5             contracts, to sue, be parties, give evidence, and to the full and equal
             benefit of all laws and proceedings for the security of persons and
6             property as is enjoyed by white citizens, and shall be subject to like
             punishment, pains, penalties, taxes, licenses, and exactions of every
7             kind, and to no other.

8         Although Section 1981 does not include an express retaliation provision, the Supreme

9   Court in *CBOCS W., Inc. v. Humphries* held that it "encompasses claims of retaliation."  553 U.S.

10  442, 457 (2008).

11        "Typically, [courts in the Ninth Circuit] apply the burden-shifting framework established

12  in *McDonnell Douglas*" to Section 1981 claims at summary judgment.  *Metoyer v. Chassman*, 504

13  F.3d 919, 930–31 (9th Cir. 2007) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

14  (1973)).  "At the first step of *McDonnell Douglas*, the plaintiff must establish a prima facie case of

15  discrimination or retaliation."  *Id.* at 931 n.6.  "To establish a prima facie case of retaliation, a

16  plaintiff must prove (1) she engaged in a protected activity; (2) she suffered an adverse

17  employment action; and (3) there was a causal connection between the two."  *Surrell v. California*

18  *Water Serv. Co.*, 518 F.3d 1097, 1108 (9th Cir. 2008).

19        "If the plaintiff makes out her prima facie case of . . . retaliation, the burden then 'shifts to

20  the defendant to articulate a legitimate, nondiscriminatory reason for its allegedly [retaliatory]

21  conduct.'"  *Metoyer*, 504 F.3d at 931 n.6 (quoting *Vasquez v. County of Los Angeles*, 349 F.3d

22  634, 640 (9th Cir.2003)).  "Finally, at the third step of *McDonnell Douglas*, if the employer

23  articulates a legitimate reason for its action, 'the presumption of discrimination drops out of the

24  picture, and the plaintiff may defeat summary judgment by satisfying the usual standard of proof

25  required . . . under Fed. R. Civ. P. 56(c).'"  *Id.* (quoting *Cornwell v. Electra Cent. Credit Union*,

26  439 F.3d 1018, 1028 (9th Cir. 2006)).  "The plaintiff may then offer evidence that 'the employer's

27  proffered nondiscriminatory reason is merely a pretext for discrimination.'"  *Surrell*, 518 F.3d at

28  1106 (quoting *Dominguez–Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1037 (9th Cir. 2005)).

The parties do not dispute the first two elements of the prima facie case of retaliation—that Dr. Bibi engaged in protected activity and that he suffered an adverse employment action.  But D&Y challenges the causal link between the two because it contends that it had conclusively decided to terminate Dr. Bibi's contract before he engaged in protected activity by complaining about Dr. Pennardt's discriminatory conduct.  *See* Docket No. 78 at 13.  Thus, D&Y argues that a reasonable jury could not conclude that it terminated Dr. Bibi's contract because of his complaint about Dr. Pennardt's discriminatory conduct.  *Id.*

Dr. Bibi first responds that the evidence, viewed in the light most favorable to him, shows that D&Y was only contemplating terminating Dr. Bibi's contract, not that it had conclusively decided to terminate his contract.  *See* Docket No. 81 at 6–7.  Therefore, he argues that a reasonable jury could conclude that Dr. Bibi's protected activity was a but-for cause of his termination simply because there was a "proximity in time" between the two events.  *See id.* at 4 (citing *Dawson v. Entek Int'l*, 630 F.3d 928, 936 (9th Cir. 2011) ("The causal link can be inferred from circumstantial evidence such as the employer's knowledge of the protected activities and the proximity in time between the protected activity and the adverse action.")).

To support this argument, Dr. Bibi points to a single email sent by D&Y to Sycamore at 7:21 a.m. on the morning of day 8 asking Sycamore to "let [D&Y] know from a scheduling timeline what works best on replacing [Dr. Bibi], and when *or if you want to replace him*."  Docket No. 81-1 ("Paul Decl."), Ex. A (emphasis added).  Dr. Bibi claims that this email shows that D&Y was still undecided about whether to terminate him as of day 8.  But this email cannot be viewed in isolation, and D&Y presents uncontroverted evidence that this email was merely the beginning of its decision-making process and that it conclusively decided to terminate Dr. Bibi's contract before he engaged in protected activity.

First, D&Y points out that at 11:17 a.m. on day 8, it sent an email to its partners explaining that "Dr. Bibi is still a recurring issue and we have backups to replace him that will work better with VxL and all of us."  McDonald Decl., Exs. D, E.  In that email, D&Y invited Sycamore to "say 'when'" on Dr. Bibi's termination.  *Id.*  Sycamore responded at 11:36 a.m. that it was "targeting a 7/29 end date for Dr. Bibi with his replacement starting on 7/30," but needed to wait

United States District Court
Northern District of California

1   for scheduling confirmation before making the final decision.  McDonald Decl., Ex. E.  At 11:45

2   a.m. on day 8, D&Y was told that "VxL confirmed to terminate Bibi at the end of his shift on [day

3   10]" and that D&Y should "coordinate Bibi's travel home" thereafter.  *Id.*

4           At 9:23 a.m. the next day, Sycamore sent an email to VxL explaining that Dr. Bibi had

5   showed up late again that morning and asking if VxL wanted Dr. Bibi to be terminated after his

6   shift on day 9 instead of, as was originally planned, after his shift on day 10.  *See* McDonald

7   Decl., Ex. F.  VxL confirmed at 11:34 a.m. that it wanted to move up Dr. Bibi's termination, and

8   Sycamore shortly thereafter forwarded the email chain to D&Y.  *See id.*  At noon that day, D&Y

9   told Sycamore that it would "make the call at [6:45pm]," near the end of Dr. Bibi's shift.  *Id.*

10  Crucially, this email correspondence all happened *after* the email from D&Y which Dr. Bibi

11  contends expresses some uncertainty about the decision to terminate Dr. Bibi's contract and *prior*

12  to Dr. Bibi lodging his complain about Dr. Pennardt.  *See* McDonald Decl., Exs. D, E, F.; SAC ¶

13  18 (explaining that Dr. Bibi spoke with D&Y starting at 1:46 p.m.).  No reasonable jury simply

14  could conclude that D&Y had not conclusively decided to terminate Dr. Bibi's contract before Dr.

15  Bibi complained about Dr. Pennardt's discriminatory conduct.

16          Likely recognizing that the difficulty of prevailing on his first argument, Dr. Bibi next

17  contends that even if the *decision* to terminate his contract was made before he engaged in

18  protected activity, what matters is that D&Y did not *execute* the termination of his contract until

19  after the protected activity.  *See* Docket No. 81 at 5.  This argument finds no support in case law.

20  In fact, courts in the Ninth Circuit have explained that "[w]here timing is the only basis for a claim

21  of retaliation, and gradual adverse job actions began well before the plaintiff had ever engaged in

22  any protected activity, an inference of retaliation does not arise."  *Saensinbandit v. Alaska*

23  *Airlines, Inc.*, No. 3:18-CV-00267 JWS, 2020 WL 1695485, at *6 (D. Alaska Apr. 7, 2020) (citing

24  *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 95 (2d Cir. 2001)); *see also Bower v. City*

25  *& Cnty. of San Francisco*, No. C 09-03507 CRB, 2011 WL 569882, at *8 (N.D. Cal. Feb. 14,

26  2011), *aff'd*, 490 F. App'x 854 (9th Cir. 2012) (citing *Slattery* for the same).  The key to a

27  retaliation claim is intent of the defendants.  Intent precedes action.  It is the timing of events

28  which informs the defendants' intent that is critical, not the subsequent implementation of that

United States District Court
Northern District of California

8

intent.

Thus, for instance, in *Seansinbandit*, the court granted summary judgment in favor of a defendant–employer on a retaliation claim where the uncontroverted evidence demonstrated that the plaintiff's protected activity occurred after defendant "had set up the meeting to tell Plaintiff about her termination," even though that meeting did not occur until after the protected activity. 2020 WL 1695485, at *6. Similarly, here, the uncontroverted evidence shows that D&Y had chosen the time and method of terminating Dr. Bibi's contract almost two hours *before* Dr. Bibi called Seibert to complain about Dr. Pennardt's conduct. *See* McDonald Decl., Ex. F. As in *Seansinbandit*, it is immaterial that D&Y did not execute the termination of Dr. Bibi's contract until after the protected activity occurred; the decision had been made. Dr. Bibi has thus failed to establish a prima facie case of retaliation under Section 1981 because he has failed to raise a triable issue of fact on the causal link between his protected activity and D&Y's decision to terminate his contract.[5]

C.    Punitive Damages

D&Y's motion for summary judgment on Dr. Bibi's retaliation claim is granted, leaving no

---

[5] Had Dr. Bibi raised a triable issue of fact on causation, the burden would shift to D&Y to establish that it had legitimate, nonretaliatory reasons for its decision to terminate his contract. *See Metoyer*, 504 F.3d at 931 n.6. D&Y has offered many nonretaliatory reasons including Dr. Bibi's consistent tardiness, his failure to treat a patient with chest pains, walking to a nursing station without proper PPE, falling asleep at work, and violating prison security policy. *See* Docket No. 78. The burden would then shift back to Dr. Bibi to raise a triable issue of fact as to the pretextual nature of D&Y's proffered reasons. *See Metoyer*, 504 F.3d at 931 n.6.

Dr. Bibi argues (1) that the temporal proximity between his protected activity and his termination can by itself give rise to an inference of pretext and (2) that there are disputed issues of fact as to many of the performance issues cited by D&Y. *See* Docket No. 81 at 5. Dr. Bibi's temporal proximity argument fails for the same reason it failed to raise a triable issue of fact as to causation: the uncontroverted evidence shows that D&Y decided to terminate Dr. Bibi before he ever engaged in protected activity. *See* McDonald Decl., Ex. E, F; *Barrier v. City of Dalles*, No. 21-35305, 2022 WL 832070, at *1 (9th Cir. Mar. 21, 2022) ("[T]he persuasive value of the temporal proximity evidence [in showing pretext] is undercut by the fact that [the employee's] supervisor began preparing a disciplinary memo concerning [the employee] weeks *before* [the employee] filed his fourth workers' compensation claim") (emphasis in original). Proximity in time cannot undo the sequence here. Dr. Bibi's second argument fails because it is irrelevant since Dr. Bibi did not establish a prima facie case. In any event, Dr. Bibi has not raised a triable issue of fact as to D&Y's genuine belief in its proffered reasons, and "courts only require that an employer honestly believed its reason for its actions, even if its reason is foolish or trivial or even baseless." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1063 (9th Cir. 2002) (internal quotation marks omitted).

United States District Court
Northern District of California

1   remaining claims from which Dr. Bibi may request punitive damages.  His argument on punitive

2   damages therefore is denied as moot.

3                           III.        **CONCLUSION**

4          For the foregoing reasons, the Court hereby **GRANTS** D&Y's motion for summary

5   judgment in its entirety.

6          This order disposes of Docket No. 78.  The Clerk is instructed to enter judgment and close

7   the case in its entirety.

8

9          **IT IS SO ORDERED**.

10

11  Dated: February 10, 2023

12

13  _____

14                                      EDWARD M. CHEN
                                        United States District Judge

15

16

17

18

19

20

21

22

23

24

25

26

27

28

United States District Court
Northern District of California